Filed 7/21/26  In re N.H. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re N.H., | B347982 |
| a Person Coming Under the Juvenile Court Law. | (Los Angeles County  Super. Ct. No. 21CCJP04067B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| A.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, George A. Turner, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Appellant A.H. (mother) appeals the termination of her parental rights over N., born in May 2015. Mother asserts that the parental benefit exception in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) applies.[1] Mother challenges the juvenile court's holding that mother failed to establish the third *Caden C.*[2] element, that termination of mother's parental rights would be detrimental to N. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

A. *Detention and Jurisdiction*

N. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in August 2021 after mother attacked N.'s 15-year-old half-brother, A., with a belt, a knife, and a screwdriver; mother also turned on the stove and tried to burn A. Neighbors and N., age six at the time, called 911. A responding officer noted that "mother smelled like alcohol and the home was dirty and filthy with roaches everywhere." When a children's social worker (CSW) met with the children, N. "blurted out, immediately, 'My mom tried to kill my big brother.'" Mother was arrested and the children were placed with a foster family.

On August 31, 2021, DCFS filed a petition under section 300, subdivisions (a), (b)(1), and (j), alleging that mother physically abused A.,

---

[1]    All undesignated section references are to the Welfare and Institutions Code.

[2]    See *In re Caden C.* (2021) 11 Cal.5th 614, 631–634.

[3]    We focus our summary on the portions of the record relevant to mother's argument on appeal.

which also placed N. at risk of harm. In January 2022, the juvenile court sustained the petition in full. N.'s father was never identified. Mother did not reunify with the children. A. is now an adult; only N. is relevant to this appeal.

B. *Reunification Period*

In October 2021, N. said she was not afraid of mother generally, but she was afraid on the day mother attacked A. The CSWs noted that in the children's interviews it appeared they provided limited information because they "were being protective of ... Mother." The children's caregiver later told CSWs that she heard mother coaching the children during phone visits, and as a result she twice ended calls. N. said she loved mother and wanted to go home to her.

In October 2021, mother denied the allegations, stating that the "police made all of this up about me pulling a knife out on [A.] and trying to kill him." She also said that she was telling A. to go to bed and he was not listening, "So, yes I got mad and spanked him. I don't give a fuck. I felt offended by him not listening to me. He slid[ ] off the bed and went into the bathroom. I followed him in the bathroom, we both fell down, and he hit himself on the sink." Mother also admitted that she had a knife or a screwdriver, but said it was for self-defense. DCFS noted that mother "display[ed] behaviors of someone with mental illness," and suggested a mental health evaluation.

A last-minute information filed January 26, 2022 noted that "no visitation schedule has been established due to Mother's unpredictable work schedule." A status review report filed July 14, 2022 stated that N. was doing well in her second foster home; she was "mentally and emotionally

3

healthy." N. reported feeling safe in the home and having a bond with the caregivers, but also said she would like to go home. Mother had had two in-person visits with the children as well as weekly phone calls with them. Mother was in compliance with her case plan, and she "appears to be invested in her children's wellbeing as she is calling and speaking with the children on a regular basis." Mother completed a parenting class and attended individual counseling, but she did not have permanent housing. Mother's counselor was "concerned that mother's underl[ying] needs are not being addressed as mother continues to have delusions of celebrities raping her and believes them to be true." The counselor had concerns about mother's alcohol use, stated that mother's "characteristics resemble schizophrenia," and believed mother was not regularly taking her prescribed psychotropic medication. The counselor recommended that mother receive more intensive treatment.

A walk-on request mother filed December 6, 2022 stated that mother was not getting her ordered six hours per week of visitation. DCFS explained that there had been difficulties scheduling in-person visits due to the children's school schedules, mother's work schedule, and mother's transportation issues. Mother nevertheless had frequent phone and video visits with the children. Mother's weekly monitored in-person visits resumed shortly thereafter.

A status review report dated January 18, 2023 stated that N. was living in her third foster home and was doing well. N. was in second grade at school and had no behavior problems. She reported that she felt safe, and she had a bond with her caregivers. N. continued to want to reunify with mother.

Mother remained in compliance with her case plan. When she spoke to case workers, mother discussed her concerns about "her children being brainwashed by caregivers." A court-ordered psychological evaluation was pending, but mother's current therapist noted that mother had been diagnosed with schizophrenia.

Mother was having frequent video visits with the children before they went to bed in the evenings, and in-person visits on weekends when they could be arranged with a monitor and mother's rotating work schedule. Mother was appropriate at the visits and engaged well with the children. The status review report noted that "Mother is very nurturing and ha[s] a healthy attachment with" N. DCFS recommended six more months of reunification services.

At the permanency hearing on February 2, 2023, the juvenile court ordered continuing reunification services. Mother was subsequently arrested for assault likely to cause great bodily injury, and was incarcerated from February 4, 2023 until April 3, 2023. From February until May 2023, the children were placed in their fourth foster home. In May 2023, A.'s father was located; he wanted to participate in the case and reunify with A. The children were then moved to N.'s fifth foster home, the home of A.'s paternal grandmother, Ms. L.

According to a status review report filed on July 19, 2023, N. reported feeling safe and happy in Ms. L.'s home. N. said she would like to stay in Ms. L.'s care, "as long as she is able to continue to see her mother … for visits." Mother had visits with the children two days per week, as well as frequent phone calls. N. said visits with mother were "fine." At in-person visits she would "play on the swing set and jungle gym while [mother] observes her. [N.] will spend some time talking to mother, … but she spends a large portion

5

of the visits playing alone on the jungle gym. [N.] stated that she does not know if she is open to seeing mother … without brother, [A.], being present as well. [N.] further stated she knows that [A.] does not want to go to unmonitored visits with mother."

A. said he did not want to return to mother or maintain a relationship with her; he said he visited mother only because he felt obligated. A. had "great relationship with his sister [(N.)] but has some characteristics of being parentified." A. did not like unmonitored visits with mother, because she would "grill" him about his placements.

Mother completed a mental health evaluation in May 2023; she was diagnosed with schizophrenia, alcohol use disorder, and cannabis use disorder. Mother expressed "bizarre delusions of sexual and paranoid nature," and was not compliant with her prescribed medications. A therapist mother had been working with for about a year, Ms. Magg, said that mother was very consistent with her visits, but she "has poor insight into her mental health diagnosis of Schizophrenia. Mother does not appear to be to be accepting of her diagnosis and does not verbalize any thoughts or feelings about it. Ms. Magg stated mother understands that she needs help but does [not] seem to understand the gravity of her diagnosis or the importance of ongoing mental health treatment."

DCFS stated that mother had not addressed the issues that led to intervention, "specifically regarding her mental health." DCFS observed that mother "does not appear to have a strong bond with her children, as she does not actively engage with them throughout their visits." DCFS opined that the children could not be returned to mother's care; "[a]lthough mother has complied with court ordered services, mother has not displayed meaningful

6

insight or demonstrated substantial changes in her ability to care for her children."

At the permanency review hearing on August 18, 2023, the juvenile court terminated reunification services and set the case for a permanency planning hearing under section 366.26.

### C.    *Post-reunification Period*

A section 366.26 report filed on November 28, 2023 stated that N. appeared to be "well adjusted in the home" of Ms. L.  N. reported that her twice weekly visits with mother were "okay" and "good."  Ms. L. reported that N. says she misses mother and "gets happy when she sees" mother.  Ms. L. reported that visits had become inconsistent as mother had a new job with a rotating schedule.  Regarding missed visits, N. said, "It's okay because she is probably busy."

A status review report filed February 6, 2024 stated that N. was doing well.  N. visited with mother twice per week.  When asked where she would like to live, N. said she wanted to live "in a fancy hotel" with Ms. L., A., and mother.  DCFS continued to recommend adoption.

On May 16, 2024, N. was removed from Ms. L.'s home into her sixth placement with prospective adoptive parents Ms. P. and Mr. C.  In July 2024, N. appeared to be "very comfortable interacting with and requesting her needs from the" caregivers.  N. said she liked living there and wanted to be adopted.  After this move, visits with mother ceased until January 19, 2025.

A status review report filed August 8, 2024 stated that N. continued to do well in Ms. P.'s home.[4]  N. visited with A. weekly.  However, N. was not

---

[4]    Some reports focused solely on Ms. P. as the caretaker, even though N. continued to live with Ms. P. and Mr. C.

having visits with mother. N. said she "does not want to visit with mother because mother told [A.] that she only cares about visiting with [N.] and not [A.]." N. said she wanted to be adopted by Ms. P. and live with Ms. P. until adulthood. Proceedings were delayed as Ms. P. awaited resource family approval.

A status review report filed October 3, 2024 stated that N., now nine years old and in fourth grade, continued to do well in Ms. P.'s home. A CSW explained the difference between adoption and guardianship to N., and N. said she wanted to be adopted. N. continued to visit with A. weekly. N. reported that she needs to see her brother regularly. This report did not mention any visits with mother. In a last-minute information filed on October 16, 2024, DCFS recommended adoption by Ms. P. as the permanent plan.

At a hearing on October 18, 2024, mother's counsel asked that the court order a social worker to work with N. to schedule visitation with mother, with the understanding that "the court can't force the child to visit with the mother if she doesn't want to." The court ordered DCFS to work with N. and mother to create a visitation schedule.

An addendum report filed December 17, 2024 stated that N. continued to do well with Ms. P. and Mr. C., who wanted to adopt her. Ms. P. and Mr. C. did not want to enter into a post-adoption contract with mother, preferring to maintain contact between N. and mother at their discretion.

A status review report filed December 24, 2024 stated that N. was willing to visit with mother, "but only if her brother [A.] is there and Ms. [P.] is nearby." Mother did not answer the CSW's phone calls. When asked about her needs, N. said "she needs to remain in contact with her brother and

wishes to be adopted." The report does not mention any visitation with mother.

A last-minute information filed January 17, 2025 discussed N.'s visitation with mother. It stated that in October 2024, N. said she "only want[s] to see mother as long as her brother [A.] is there. She reported she is afraid her mother will take her or something if [A.] is not there." In November 2024, a CSW spoke with N. about visits with mother, and N. said that "she does not know if she wants to see [mother]. She says she want[s] to see her if [A.] or the Social Worker is there. She reports she will feel more comfortable. [The CSW] asked [N.] how often does she want[ ] to see her. [N.] reports probably like once a month." The CSW attempted to contact mother to schedule a visit, and finally spoke with mother on January 15, 2025. The CSW arranged for two-hour visits every other Sunday, beginning on January 19.

A section 366.26 report filed February 6, 2025 stated that A., now an adult, spoke with a CSW about two recent visits with N. and mother. A. stated that "the visits have been going well and that he has been present for both." A. said that N. "is engaged during the visits with mother and that he sees her happy; however, he mentioned that [N.] has continued to state that she only wants to have visits if he is present" because "it makes her feel safer." A. said that mother is homeless; she contacts him periodically "when she needs 'a few bucks' and he will meet her to help her out."

The CSW also spoke with Ms. P. about the visits with mother. Ms. P. "reported that the two visits went well and she reported no concerns at this time…. Ms. P reported that mother and child [N.] engaged throughout the entire visit and child [N.] appeared content. However, Ms. P did report[ ] that before the visit on 2/2/2025, child [N.] mentioned she did not want to go

9

to the visit, but Ms. P encouraged her and she agreed. In addition, Ms. P reported that child [N.] has verbalized to her and to [A.] that she wants him present in all the visits, if not she does not want to attend." Ms. P. noted that N. did not seem any different emotionally after visits, and N. did not ask to see mother more often. Mother was appropriate and attentive at the visits; she played with N. Mother told the CSW that visits were going well, but she did not elaborate.

In the section 366.26 report, DCFS noted that mother's current visitation was very limited, and opined that "[s]evering the relationship would not cause [N. to suffer] emotional instability or preoccupation." DCFS concluded that "the loss of the child-parent relationship would not have a negative effect on [N.] and [she] would benefit from the security of an adoptive home."

A last-minute information filed February 20, 2025 stated that mother and N. had a visit on February 16. On the way to the visit, N. "asked when can she stop the visits. She says she like[s] to see her mom but not this often." After the visit began, N. seemed comfortable with mother.

At a hearing on February 21, 2025, mother requested additional monitored visits so the relationship between mother and N. could be better assessed. The court granted mother's request. A last-minute information filed April 9, 2025 stated that mother missed scheduled visits on March 2, 19, 26, and April 2. Mother attended visits on March 16, March 23, and April 5. At the March 16 visit, mother arrived late because she missed her bus; mother brought N. gifts and snacks, and played basketball with her. On the April 5 visit, mother brought a man whom A. said was mother's boyfriend. The monitor noted that mother brought sandwiches for A. and N. and played basketball with the children, but "[d]uring the visit mom mostly sat down

10

and talked to her male friend." At the end of the visit, N. gave mother "a long hug." A last-minute information filed on April 23, 2025 noted that N. continued to state that she was only comfortable meeting with mother in the presence of A. or Ms. P.

An addendum report filed May 19, 2025 stated that the CSW had spoken with N. regarding adoption, and N. said she wanted to be adopted. A last-minute information filed May 21, 2025 stated that mother had not had any additional visits with N. Mother missed visits scheduled for April 27, May 11, and May 20. N. said she wanted to see mother, but not every week.

A status review report filed on July 2, 2025 stated that N. continued to do well in Ms. P.'s home, and that A. was now living in the home as well. During a call on June 3, mother told N. she was getting a house and that N. was going to come live with her. Ms. P. stopped mother and ended the call. Mother continued to visit with N. "sporadically" and usually was appropriate during visits.

A last-minute information filed July 2, 2025 stated that at most visits, mother was appropriate and spoke with N. about N.'s life. At a visit on June 22, however, mother was concerned about N.'s safety: "Mom appears traumatized and pleads with caregiver to keep her daughter safe." N. had recently stated that she missed mother.

D.    *Termination of Parental Rights*

At the section 366.26 hearing on July 18, 2025, ten-year-old N. testified. N. was questioned extensively to determine whether she knew the difference between adoption and legal guardianship. N.'s counsel reminded her that adoption would mean that mother's parental rights would be terminated. When asked what she wanted, N. responded, "Just to be adopted

and have a family and speak to my mom a little bit." N. testified that she enjoyed visits with mother, because "We just have a good time. We get to know each other better, and that's pretty much all." N. said if she could never see mother again, "I would be pretty sad, but at least I would be—get to talk to her." N. said that when mother does not come to visits, "I feel okay. I don't feel happy, and I don't feel sad. I just feel okay." And when mother leaves visits early, "It's fine."

Counsel for DCFS clarified that N. wanted to be adopted, even if there was another option that meant N. would no longer have to go to court. N. agreed that adoption was what she wanted. When asked if she would return to mother if that were an option, N. said no.

Counsel for mother clarified with N. that adoption meant that mother would no longer be N.'s mother. N. said she understood. N. also said that she understood there was a possibility she would no longer be able to see or speak to mother, and if that happened, "I'd be a little bit sad, but I wouldn't be too sad." When asked if she tells mother "little secrets that little girls tell their mommies," N. said, "I don't think so." When asked if she told mother anything "that you don't say to other people," N. said, "No, not really." N. agreed that she enjoyed visits and hugged mother. Mother's counsel asked a series of questions about whether N. understood the difference between adoption and legal guardianship; N. repeatedly answered that she did understand. When asked how she would feel if mother tried to get visitation in the future, N. responded, "I really wouldn't care." The court then asked N., "Based on all of the things that you learned in this courtroom through these questions, does your answer change? Do you still want to be a legal guardian [*sic*] or adoption?" N. responded, "Adoption."

12

Mother also testified at the hearing. Mother said she was consistent in her visitation, but sometimes the schedule changed because the children had other things to do. Mother testified that she brought food to visits with N., they talked about school and friends, and they played sports together. When asked about N.'s statements that she wanted to be adopted, mother said that N. "sounded confused" and said, "They are brainwashing her or something." Mother said that N. wants to spend more time with her, and that N. is now comfortable visiting without A. present. When asked about what she provides for N., mother responded, "Nourishment, care, love, attention, affection and everything she needs as far as I can get." Mother also testified, "I want my daughter back." Mother said she would prefer legal guardianship over adoption, and that N. would miss mother if she could not see her. When questioned by N.'s counsel, mother testified that she recently told N. that she could come home to mother's house, and that "I was going to come fight for her at the courthouse." When asked if she said this to N. at a visit, mother replied, "Maybe one time I mentioned it, yes."

When questioned by counsel for DCFS, mother admitted that she brought her boyfriend to a visit on June 29, despite being told that he was not allowed to accompany her to visits. Mother testified that her current visitation schedule was on Sundays from 1:00 to 3:00.

Mother, through counsel, asserted that the parental benefit exception to adoption applied. As discussed more fully below, there are "three elements the parent must prove to establish the [parental-benefit] exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.)

13

Mother argued that her visitation had been consistent to the extent she was able to be present. She also asserted that although N. initially only wanted to visit with A. present, recently N. had become more comfortable visiting without A. there. Mother argued that she and N. had a close relationship, and because N. was removed at six years old, she had been with mother for more than half of her life. She also pointed out that N. testified that she would be sad if she could not talk to mother. Mother further contended that terminating the relationship would be detrimental to N., because she enjoyed seeing mother and "it would be extremely detrimental to wipe that smile off that child's face."

DCFS and N. argued that mother's parental rights should be terminated and N. should be freed for adoption. N.'s counsel argued that mother's visitation had not been consistent. The relationship between N. and mother was pleasant, but it was not something N. felt deeply about, as demonstrated by her lack of emotion about visits and cancellations and her testimony about how she would feel if contact with mother ended. N.'s counsel also pointed out that N. had been in six placements, so the stability and permanency of adoption would be beneficial compared to the potential for ongoing disruptions that can occur in legal guardianships.

Counsel for DCFS argued that N. had been very clear and unwavering about her desire to be adopted, despite the questioning by multiple attorneys. N. never wanted unmonitored visits with mother and was still only comfortable with mother if a monitor was present.

The court found that mother met the first element of regular visitation and contact, and the second element of a beneficial relationship. The court found the third element, that termination of the relationship would be detrimental to N., had not been met. The court stated, "At this point, I

14

believe that there is a huge benefit of this sort of permanency [of adoption] versus a relatively small sort of loss of a parental relationship." The court also observed that even though N. "was very clear that she does want to have a relationship with mother," she was also "willing and interested and passionate about the stability associated with adoption," which is "something that she deserves." The juvenile court therefore found that the parental relationship exception did not apply, and terminated mother's parental rights.

Mother timely appealed.

## DISCUSSION

Mother argues the juvenile court erred in finding that she failed to prove the third element of the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i). We find no error.

### A. *Legal Standards*

At a permanency planning hearing after termination of reunification services, adoption is the "'first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Thus, once the trial court finds at a section 366.26 hearing that "it is likely the child will be adopted," "the court shall terminate parental rights unless" one of the statutory exceptions applies. (§ 366.26, subd. (c)(1).)

To find that an exception applies, the court must find "a compelling reason for determining that termination would be detrimental to the child."

(§ 366.26, subd. (c)(1)(B).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R., supra*, 31 Cal.4th at p. 53.)

One of the statutory exceptions is the beneficial parental relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at p. 630.)

As noted above, "the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C., supra*, 11 Cal.5th at pp. 636–637.)

Mother challenges the juvenile court's ruling on only the third element. A juvenile court's determination on the third element "is discretionary and

16

properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at p. 640.)  However, "[t]he parent bears the burden to show the statutory exception applies." (*In re M.V.* (2025) 109 Cal.App.5th 486, 508.)  "[W]hen the party with the burden of proof did not carry the burden, 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Ibid.*)

### B.    *Analysis*

Mother asserts that she and N. had a healthy attachment and it would be detrimental to N. to sever it.  She points out that N. said she would like to live in a hotel with mother and A., and N. once said that she missed mother.  Mother further notes N.'s statements that she would like to be able to continue talking to mother, and she questions whether N., age ten when she testified, "really underst[ood] that adoption would mean no relationship ever again with her mother."

Mother has not demonstrated that the evidence compels a finding in her favor as a matter of law.  N. made clear that she would like to continue to speak to mother, but also that if she had to make a choice, she wanted to be adopted.  The evidence showed that N. was indifferent about visits with mother.  She did not mind when visits were missed or cancelled.  When asked if she spoke with mother about things she did not talk to other people about, N. said no.  Ms. P. observed that N. was no different emotionally before or after visits with mother, suggesting that the visits did not have a significant

17

impact on N. Over the three-year life of the case, N. never felt comfortable being with mother alone. N. was clearly capable of expressing her choices; for example, she told DCFS that she wanted continued visits with A. Regarding mother, however, N. expressed that she did not want to be alone with mother and she wanted to visit mother less.

By contrast, N. was clear that she wanted to be adopted. She stated that she wanted Ms. P. to be her parent, and that she wanted the stability of an adoptive home. After six placements in less than four years, N. expressed a desire for stability and permanency.

When considering the third element, "the question is … whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.) Although N. loved mother and enjoyed their visits, the record showed that the harm of severing N.'s relationship with mother would not outweigh the benefits of stability and permanency that N. would gain with adoption. Thus, mother has not demonstrated that the juvenile court erred in finding that the parental benefit exception to adoption does not apply here.

**DISPOSITION**

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COGLIATI, J.*

We concur:


ZUKIN, P. J.


TAMZARIAN, J.

---

*Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.